Good morning, Your Honors. Roman Kesselman for the Petitioner, and may it please the Court. I do want to reserve as much time as I have left. I'm not intending to use the whole ten minutes for my presentation. I'll reserve these three minutes for a rebuttal, if I may.  Thank you. So, Your Honors, we're asking you to review a decision by the Board that affirmed the decision by the Immigration Judge in a case where the main form of relief was the protection under the Convention Against Torture. And unfortunately, both the Immigration Judge and the Board spent very little time in their decisions addressing all the issues under the Convention Against Torture. Counsel, it did seem like the one thing that the Immigration Judge did do was say that there was no evidence that Mr. Doni had faced any threats of torture or would face any threats of torture when he returned. Why isn't that enough on its own to deny the CAT claim? Well, Your Honor, simply because that ignores the evidence submitted by Mr. Doni. And the Court is not free to just ignore the U.S. Department of State report and all other evidence in this case. So, the IJ didn't expressly reference the country report, but we have a presumption that the agency reviews everything in the record, absent some evidence that they did not. So, was there any evidence that the IJ declined to look at the country reports? Let me answer that in this way, Your Honor. The Board and the Judge both made a predictive finding, creating that hypothetical link between the petitioner and what is likely to happen to him in Moldova, in the country of persecution. And in doing so, they relied on the Waker case that specifically declined to extend the relief under the Convention Against Torture to a person who proclaimed to be a Chinese Christian and offered only evidence of general government abuse and torture of detainees, but without specifically stating that Chinese Christians are the group of people likely to face torture. This is a fundamentally different case. Here, we have a person who is indisputably sought by the police in his native country. They went as far as issuing what's called a blue Interpol notice to find him, to cause him problems. There are search warrants. His parents are saying they're still seeking information about him and promising to detain him upon arrival. Does any of that amount to torture? That in itself, of course not, Your Honor. But just like the judge stated, that arrest in itself is not torture, and we agree with that. The missing factual finding in this case is what happens to those who are arrested and detained on allegations of committing some crime. And mind you, the allegation here really amounts to a petite theft. But the police, for some reason, and we explain what that reason is, went to a great deal of trouble to find this person. So what happens when the person is detained is what's missing from both the immigration judge's decision and the board's discussion. It does reference the, said that the IJ's determination was supported by substantial evidence, even in light of the country reports. So why wouldn't we defer to that? What is it that makes that, that we're compelled to find a different result? Well, simply because of the standard of the clear error in findings of facts or actually missing findings of facts. The report, the evidence, clearly states that the very people that we're talking about, that particular petitioner, is susceptible to torture if he is detained. Because the report states that in a country of a few million people, there are hundreds of reports of police torture. And more, half of them coming from the criminal police. That's the very institution that issued this case. And the report also states that the actual number of reports of torture is underreported. The actual number of cases underreported, most likely, because of what is happening in the country with corruption and ineffective judiciary. If we agree with you that the agency didn't properly consider the full record, does harmless error review apply in this context? Like if we say, yes, there was an error, but we look at the evidence ourselves and think, still is not going to get you there. Could we say that it was a harmless error? Well, if you don't believe the United States Department of State report, then you could call it a harmless error. I just think it's not a harmless error. I'm asking the legal point. Does harmless error review apply in this context? The board seems to state so, Your Honors. It's a matter of wording. I think if you do not see the missing factual findings and the information in the report itself, then you could say that, yes, it does apply. However, I think we're going with the notion that when the U.S. Department of State report says these people are susceptible to torture, the courts have to give it some deference. And not addressing those specific facts in the findings is a reversible error. I don't see how else to read the law and the report provided by the U.S. Department of State. If I understand you, you're saying that the IJ made a prediction that Mr. Doney would not, more likely than not, be singled out for torture on his return. And you're saying that the BIA should have determined that that finding was clearly erroneous. Is that what you're arguing? The BIA should have said that was clearly erroneous in light of the country report. Your Honor, BIA had two options. They could have stated that that was a clear error, or they could have remanded the case for additional factual findings that were missing from the judge's decision. Because he simply stopped at saying, well, in the worst case, he will be detained and prosecuted for the crime that he is alleged to have committed. However, that shouldn't be the end of the analysis. That shouldn't be the end of the factual findings in this case when we're submitted hundreds of pages of evidence that police, in fact, torture routinely people under these circumstances. And so the BIA's determination that the IJ's prediction was supported, had substantial evidence supporting it, even in light of the country report. You're saying that was not supported by substantial evidence? The BIA's determination was not? Is that what you're saying? What I'm saying, Your Honor, is I'm not convinced the BIA actually engaged in a de novo review of factual findings missing from the judge's. Okay, so it just looked at the record and said that the IJ's interpretation was supported by substantial evidence in light of the record as a whole. And you don't think the BIA actually did that? I don't believe so. And I'm reading their decision to actually indicate that. They're relying on the Wakery case to basically compare and contrast this case. And they're saying this is very similar to the Wakery case where somebody just submits some evidence of torture in the country without linking himself specifically to that torture, to the possibility of torture. Whereas in this case, the very allegation is this is the people, these are the people who get tortured in that country. Okay, do you want to save the rest of the time? Yes, please, Your Honor. Thank you. Okay. Good morning, Your Honors, Counsel, and may it please the Court, my name is Rob Stalzer. I'm here on behalf of the Attorney General. Your Honors, I'm going to dive right into the Convention Against Torture issue. First, the country conditions reports, contrary to my brother counsel's suggestion, didn't say these people, these particular police officers, were torturers. It said that torture occurs in custodial circumstances. And that's what Judge Walsh below was looking for, right? Because we know from Wakery that it's not enough to have a country report that says some custodial torture occurs. We have to have a reason to believe that this particular applicant could face a likelihood of torture. So Judge Walsh goes, okay, well, your parents were in their custody, and they said that they believed that the police officers told the parents that we will take appropriate measures if your son returns. And then they said, we believe that the officers were referring to criminal charges and torture. That itself is an equivocal statement. We believe the police were talking about torture when they said appropriate measures. That's a stretch. So the immigration judge then goes, says, well, what did these particular police officers do to the parents? Did they torture the parents? Because that would be evidence that they're likely to torture a petitioner, right? Past torture demonstrates the likelihood of future torture. And they didn't torture the parents. The parents said they had never been physically harmed. And that's why the board can then turn and say, okay, this conclusion of the immigration judge isn't clearly erroneous because it's supported. He testified the parents weren't tortured, even though the police had them in their clutches. Isn't it true that there's nothing in the record to tell us that the immigration judge actually considered the country report? We only have the immigration judge's statement at the top of his decision where he's still recounting the evidence that's been submitted. I think Exhibit 5 was the country reports. And he mentions that Exhibit 5 has been accepted into the evidence. But in his actual analysis, I think he was more interested in what was going to happen with these particular police officers. Because that was petitioner's particular claim, that these police officers in particular were going to hurt him. So is that – so I want to make sure I understand your position. Are you saying that an alien has to have proof that a particular government actor has a reputation for being – for torturing others as opposed to a body of the government generally? So in this case, it's law enforcement. But they'd have to say Officer Smith or whatever. He tortures people. Some reason – some reason to believe that he in particular faces a likelihood of torture, not just a country report that says it's a possibility. What makes it – so that's what happened here, right? He comes to court and he says, look, I come from Moldova. There's some custodial torture in Moldova. That's not enough, right? I have to have a reason to believe that he in particular faces a likelihood. One way he could do that, the way he did in this case, was to say these particular police officers have taken an interest in me. And that's what the immigration judge then looks into his analysis and says, well, what did these police officers do? So I think the one thing that gives me – I don't even know if pause is the right word. But it's interesting that the BIA – so the IJ doesn't specifically mention the country reports. Then the BIA sort of papers over it and does mention it. If the IJ decision is correct and defensible and the BIA says, OK, we agree that you were defensible, but there's another reason why you were also right, I mean, isn't the BIA limited to looking at the reasons that the IJ discussed? The board cannot engage in fact-finding, but I don't believe they did here. Right? In that paragraph. So mentioning facts that the IJ didn't specifically rely on, I know we have a question about whether they may have implicitly relied upon it. But that's not error in and of itself. No, and I don't – well, I don't believe that's what the board did here. Right? The board – the sentence is, we acknowledge the evidence of record reflecting that corrupt officials have tortured individuals in Moldova, and they cite petitioner's brief below. I don't think that exceeds clear error review for the board to simply say, hey, we see your argument. You've brought this to us in your appeal brief. We see that. And the very next sentence says, nevertheless, the record supports the immigration judge's findings. And the sentence after that is, in particular, the record supports the immigration – the board goes right back to the IJ's findings, not its own fact-finding based on the 2016 country reports. So that's why I don't believe that the board exceeded clear error review here. So – but if the board had said, well, you know, the IJ had it mostly right, but the country reports make this even further clear, would that have been clear error? I think if they had said that, yeah, probably. They can't – we know from the standard review regulations that the board can't engage in its own appellate fact-finding. And it sounds like – Well, that's what I'm trying to flesh out is to what degree is this fact-finding versus just mentioning – I don't see fact-finding here from the board because, again, they're explicit in particular. When they drill down what is supporting the basis of our decision, they go right back to the immigration judge's conclusions that the respondent's parents were never physically harmed and that the evidence does not reveal the situation will escalate. And I might add, for our purposes here under substantial evidence review, it wasn't just the parents that these particular police officers had in their clutches. It was petitioner's co-conspirator, too, right? Mikhail wrote the letter, and he said that he encountered these police officers in August 2014 where they demanded money from him. They tried to extort him, just like they did the police, and he refused to pay, and he wasn't harmed. And the police ran into him again in December 2014, according to Mikhail's letter, and he wasn't harmed. So when we want to talk about what is likely to occur with these police officers, we just don't have the evidence here that escalates it above a mere possibility. Well, so under your theory, under the government's theory here, what good is the government report? Because if the asylum seeker has to bring in evidence that he himself was specifically facing it, well, obviously a government country report isn't ever going to provide that information. Right. Well, I think Macari tells us it gets you part of the way there, right? If we know that there's a propensity or a possibility of torturing, custodial torture in this country, and the applicant comes forward and says, oh, yeah, they've threatened to torture me, they tortured all my friends, they tortured my parents, you know, these particular officers have been going around, they're like well-known torturers, that would say, okay, well, obviously the country report gets you part way there. What if the country report said, I don't know if any of these would ever say this, but, you know, we've done an analysis and it looks like 60% of all prisoners that are detained or criminal defendants that are detained are tortured? I was thinking about that on the way over here, Your Honor, a very similar hypo, and I think that would be very strong evidence going to whether it's more likely than not that a person would be tortured in custody. If you could show that this country routinely tortures 60%, that sounds like it's more likely than not. That's not what the country report says here. No. The country report we have said there was 322 cases reported in a year, which doesn't include all of them because many people, you know, cases go unreported. In a country of 3.5 million, we're not at 60%, Your Honor. We're somewhere south of that, and that's why the petitioner needed to bring particular evidence that he has a problem. And he just doesn't. He's got this attenuated statement from the parents. They believe appropriate action threatened by the police officers includes criminal prosecution and torture. The basis of that belief is we're not sure. I might also add on the torture issue, petitioner has used the word torture pretty fast and loose. Initially, he testified that his parents were tortured, and then he pulled back and said, no, no, no, they were never physically harmed. They were scared. So when we see that word torture, and I think the board noted that in a footnote, and I think we put it in our brief, was simply, you know, you can't show up to court and say, look, I could be tortured. I could be beaten. I don't know what that means. You have to show me that your beating is going to be sufficiently severe that it constitutes torture, that when you say torture, they threaten to torture me, we mean torture under the act, torture under the regulations, excuse me. But don't we need something from the IJ to tell us why the country report is not compelling in this case or why it doesn't connect all the links that need to be made? I mean, we're doing that, and the BIA did that a little bit in terms of thinking about how strong this country report is, but don't we need the IJ to do that? I don't think so, again, because the IJ was, Judge Walsh was specifically looking at what was going to happen, what petitioner said was going to happen to him. He's not simply saying there's a mere possibility I could be incarcerated and then I could be tortured. He's saying these particular police officers are coming after me to torture me, but there wasn't evidence for that, right? That's what the IJ was looking at, was saying, hey, look, your parents weren't tortured. They were in their clutches, and they weren't tortured. You need more information to give us a reason to believe that you, more likely than not, will be tortured. With respect to the asylum claims, I know that wasn't discussed by a petitioner, but for the reasons stated in our brief, we believe that there isn't an asylum claim because there was no nexus to one of the protected grounds. Just one last question. Was it raised in the briefs sufficiently by the petitioner to suggest that we should remand this because the BIA may have extended beyond the analysis of the IJ? No, Your Honor, it wasn't raised in brief, and I believe my brother counsel has conceded that. He thought the board didn't exceed clear error review here, and I agree. They haven't made any fact-finding based on that 2016 report. Instead, they wrap it back to the IJ's actual factual findings. That's clear error review, and that wouldn't be a basis on which to remand. If there are no other questions, I won't belabor the point. Apparently not. Thank you for your time. Thank you. You have a minute and a half. Thank you, Your Honor. Well, first of all, what happened to parents is not necessarily outcome-determinative of what happens to this particular petitioner. These are not just a few police officers. The report says that the police as a whole operates in that manner. Certainly, whenever you are detained, and the judge specifically acknowledged that this might happen to him, he may be detained. The report specifically says that police routinely use torture to extract confessions, cooperation, and as a punishment. Therefore, that in itself is enough to cause fear of torture, and to conclude that more likely than not, that's what might happen. The judge acknowledged that he is likely to be detained. That's a very possible outcome. The logical conclusion is what you should expect is what the U.S. Department of State report says will happen to you. It's not the parents who had a search warrant issued against them. It's not the friends who had a search warrant issued against them, or an Interpol notice for that matter. It's this particular person by the Department of Police of a country. That's a very serious fact that a lot of times is not even present in cases, but it's indisputable. They've been looking for him, and there's hundreds of pages of evidence that they routinely torture people in custody. That's a clear error by the board, by the judge. Factual findings are missing in this case, and it needs to be remanded for those factual findings. Thank you, Your Honors. I think we have your argument. Thank you. We thank both sides for the argument. The case of Iandoni v. Barr is submitted, and we're adjourned for this session. All rise.
judges: Ikuta, R. Nelson, Hunsaker